# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**WALTER C. SMITH,**

      **Plaintiff,**

**v.**                                       **Case No.  8:07-cv-78-T-30TBM**

**CA, INC.,**

      **Defendant.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant CA, Inc.'s Motion for Summary Judgment (Dkt. 60) and Plaintiff's Response in opposition to the same (Dkt. 71). The Court, having reviewed the motion, response, and supporting memoranda, and being otherwise fully advised in the premises, determines the Motion should be granted.

## Background

In May of 2005, Defendant CA, Inc. ("CA" or "Defendant") hired Plaintiff Walter Smith, a biracial male, as a Data & Life Cycle Management Telesales Executive. CA is a multinational computer software company. During his employment with CA, Smith claims he was subjected to discrimination, harassment and retaliation on account of his race.

The first incident Smith reports occurred on or about October 1, 2005. Smith's direct supervisor, Jason Dondzil, overheard Gregg Heggeland, a co-worker, refer to Smith as a "boy." Smith told Heggeland that he would not tolerate such language and asked Dondzil

to speak informally to Heggeland.  Smith did not report the incident or file a complaint with CA's Human Resources ("HR") department.

Later in October of 2005, another employee complained to HR about Heggeland's conduct, including the comments made to Smith.  After conducting an investigation that included interviews of Smith and Heggeland, CA decided to terminate Heggeland's employment.[1]  In addition, CA placed Dondzil on a Performance Improvement Plan ("PIP") as a result of his failure to report Heggeland's conduct.

In April of 2006, CA underwent a restructuring.  As a result, Smith was assigned to a new supervisor named Tim Greco.  Smith claims that following the restructuring, Greco began discriminating against him because of Smith's involvement in CA's investigation of Heggeland.  During his deposition, Smith stated:

> I feel that Gregg Heggeland and Tim Greco are close friends.  They're also associated with the fraternity.  So once I get put on Tim Greco's team, then all of a sudden that's when everything internally within CA begins to change for me for the worse.

(Smith Dep. at 139).[2]  Smith also claims Greco expressed surprise in reference to Smith's involvement in a paternity suit.   Smith claims Greco stated he was surprised an African American father like Smith would fight so hard for custody of his children.

---

[1]Upon investigation, CA determined Heggeland had referred to Smith as a "bitch" and a "boy" on multiple occasions.

[2]Greco denies that he and Heggeland are (or ever were) socially friends.  There is no evidence in the record identifying the fraternity Smith refers to.

On or about May 23, 2006, Greco placed Smith on a PIP.  The performance issues highlighted in the PIP included Smith's insufficient revenue attainment, insufficient pipeline and forecast, unsatisfactory sales metrics, and failure to adhere to his work schedule.  The parties agree that Smith was frequently absent from work to attend to matters in his paternity case.  As in the instant action, Smith represented himself *pro se* in the paternity case.  While Smith acknowledges he had issues with excessive absences, he argues the remainder of the PIP was without merit.  During his deposition, Smith made the following comments regarding his placement on the PIP:

> And like I said, had Tim Greco and his PIP plan only addressed the missing work issue, then we probably wouldn't have a problem, because I would agree. Stepping outside of Walt Smith and being a neutral third person, you know, that's a legitimate claim.  But there were some things that I felt were not legitimate claims and were far-fetched, were nitpicking and looking for reasons to get fired.

(Smith Dep. at 36).  Smith further claimed in his deposition that his prior manager was more tolerant than was Greco of him missing days to attend to his paternity case.  (Smith Dep. at 37).

In July of 2006, Smith made a formal complaint with HR alleging his placement on the PIP was racially discriminatory and constituted retaliation by Greco because of Smith's role in the Heggeland investigation.  Smith also claimed to have been classified as African American against his will in CA's records system, and referenced incidents involving two

other employees he believed had experienced incidents of discrimination at CA.[3]  Senior HR

Generalist Melinda Dorgan conducted an internal investigation of Smith's claims.

During the investigation, Smith identified additional instances of alleged

discrimination.  Smith claimed a co-worker informed a client contact that Smith was no

longer with CA.  Another co-worker hung a picture of a blue fish near Smith's cubicle with

the words "Tim Greco scares the heck out of me" printed across the bottom.  Smith believed

the picture was racially discriminatory and that it was posted in reference to a vomiting

incident that had occurred previously.[4]  When Smith complained about the picture, it was

removed.  Smith also complained that he had been barred from accessing his personal email

account from work.  His access was restored after he complained about the issue.

On or about August 15, 2006, Smith filed a charge with the Equal Employment

Opportunity Commission ("EEOC") alleging racial discrimination and retaliation.  Later that

month, Dorgan completed her internal investigation.  In an internal "Note to File" dated

August 30, 2006, Dorgan summarized her findings.  Dorgan noted a number of inappropriate

actions on behalf of Greco.  Most notably, Greco had incorrectly categorized Smith's

---

[3]Smith requested that HR classify him as Caucasian rather than African American.  CA ultimately complied with his request.  In his deposition, Smith explained that he is biracial, stating that "I pick and choose what I call myself, or how I identify myself, dependent on the situation at hand and what's beneficial for me at the time."  (Smith Dep. at 11).  Smith further explained that he has suffered racism from both sides, stating "since I get hit from both sides, I play both sides." (Smith Dep. at 11).

[4]Sometime in May of 2006, Smith had complained that he was sick but Greco would not allow him to go home.  Smith later started vomiting in a trash can in the office.  When he was asked to go home, he refused.  Smith finally went home when he was directed to do so by HR.

incremental revenue as non-incremental revenue on at least two occasions.  According to Dorgan's notes, Greco had wanted to move forward with Smith's termination thirty days into the sixty day PIP based in part on this inaccurate information.  Dorgan further noted Greco had incorrectly accused Smith of being the only offender of not leaving voice messages prior to disconnecting calls with clients or prospective clients.[5]  It is unclear whether all of Dorgan's conclusions are included in the record.  CA has filed a Declaration of Melinda Dorgan in which Dorgan states HR ultimately concluded that the PIP was justified with respect to its concerns that Smith's non-incremental revenue level was intolerably high.  According to Dorgan, CA concluded there was no evidence that Smith had been subjected to discrimination or harassment on account of his race.

In her Declaration, Dorgan also states Smith had been placed on the PIP primarily due to his failure to adhere to CA's policies with respect to requesting time off.  While CA did not oppose his right to take time off to attend Court dates, it did require him to seek pre-approval from Tim Greco, his supervisor.  Dorgan claims she made clear to Smith that he was required to provide her with legal documentation of any upcoming court dates.  After reviewing the documentation, Dorgan would inform Greco that she had verified the documents.  Ultimately Greco, as Smith's supervisor, had the authority to grant or deny Smith's request for time off.

---

[5]According to Smith, the other employees who were not reprimanded for not leaving messages were Caucasian.

In September of 2006, Smith was assigned to a new supervisor, Marjorie Martinez. On or about September 11, 2006, Smith asked HR Generalist Alicia Kilburn to approve time off. According to Kilburn, she explained to him that only his manager could approve time off. Smith again requested approval for time off from Kilburn on September 29, 2006, and was again reminded of the policy. According to Smith, he kept going back to HR because he did not want to have to disclose his personal legal issues to another employee. As Martinez was pregnant, Smith knew she would soon be leaving and he would then have to disclose the matter to yet another employee. When Martinez did go out on maternity leave in early October of 2006, Smith was assigned to Michael Golden, who had been Martinez's supervisor, rather than her replacement. According to CA, this was done to address Smith's concerns over privacy.[6]

On or about September 28, 2006, opposing counsel in Smith's paternity case served CA with a subpoena for Smith's employment records. Smith informed CA that he had objected to the subpoena and asked that CA not comply. The attorney advised CA that Smith had failed to formally object to the subpoena. CA claims that as a result of Smith's failure to formally object to the subpoena, it was required to comply. Smith claims CA's compliance with the subpoena over his objection was further evidence of discrimination and retaliation.

---

[6]Smith had previously requested to report directly to Golden rather than to Martinez.

On or about October 13, 2006, HR Manager Jacquelyn O'Neill-Walsh sent an email to Smith addressing his continued failure to comply with CA's attendance policy. O'Neill-Walsh warned Smith that his job would be in jeopardy if he failed to follow proper procedures. On October 20, 2006, Smith met with O'Neill-Walsh, Kilburn and Golden to discuss the issue. At that time he advised them of upcoming court dates. He was again warned that failure to properly report and account for his absences would result in termination.

On October 25, 2006, at approximately 5:45 p.m., Smith advised Golden that he needed the following day off for a court hearing.[7] The hearing, however, actually occurred on October 25, 2006, and the October 26th hearing had been cancelled.[8] Golden claims Smith told him HR had verified that his request was appropriate. Smith claims he told Golden only that he had notified HR of his intent to take the day off, not that they had approved it. Smith claims that he was seeking Golden's approval for the absence as he had been instructed to do. As it was too late in the day to contact HR, Golden approved Smith's absence.

---

[7]According to Golden, Smith had not mentioned the October 26th court date during the October 20th meeting. Smith has, however, produced a copy of an October 2, 2006 email that references his upcoming October 26th court appearance. Smith copied Alicia Kilburn on the email. Smith also included the date in list of requested dates off forwarded to Marjorie Martinez on August 31, 2006. It is unclear whether he received approval for this request at that time.

[8]It is unclear when Smith and CA were made aware that the hearing had been cancelled. Regardless of when he was notified of the cancellation, Smith did not report to work on October 26th.

On the morning of October 26, 2006, Smith contacted Casey Gwozdz regarding a demonstration that was scheduled that morning.  Gwozdz and Smith were scheduled to conduct a Web-based demonstration with a client that afternoon.  Smith told Gwozdz that he would call him back if he could find someone to cover for him.  According to Smith, he told Gwozdz to cancel the demonstration if no one could cover it.  Gwozdz claims Smith never called him back to tell him whether someone could cover for him or if he preferred to reschedule the demonstration.  When Gwozdz observed the client was logged into the web demo that afternoon, he contacted Golden as Smith had not provided him with the pin numbers needed to communicate verbally with the client.  After significant delay, Golden and Gwozdz were able to complete the web demo with the prospective client.

On October 27, 2006, Smith wore a Muslim head scarf to work for Halloween.  At some point he borrowed a toy gun from a co-worker.  Goldman received a complaint from another employee that Smith was making terrorist references while dressed up in his costume.  On the same day, Goldman and Kilburn questioned Smith about why he had not called Gwozdz back regarding the scheduled demonstration.  In response, Smith claimed that his cell phone battery had died.  Smith was also questioned as to why he failed to submit a proper request in SAP for his requested day off on October 26th and why he had failed to identify the date during the October 20th meeting.  Smith responded that he had sent out a calendar invite for the court date, which he had shown to Golden when he requested the day off on October 25th.  Smith has produced a copy of an email from Martinez to a Matthew Kalmenson dated October 5, 2006, noting that October 26th was an approved date for which

Smith had official legal paperwork and that HR had been notified and provided with copies of the paperwork.

On October 30, 2006, Smith asked Kilburn if he was eligible to apply for a receptionist position.  Smith did not formally apply for a transfer.  The next day, October 31, 2006, CA made the decision to terminate Smith's employment for misconduct.  According to CA's Regional Manager of HR, Beth Conway, Smith was terminated for his "continued failure to follow CA's policies, principally with regard to attendance and requesting time off, and for engaging in dishonesty."[9]  (Declaration of Beth Conway at 6).

Conway noted in her Declaration that Dorgan had initially erroneously advised Smith that he could record time off for court proceedings as jury duty.  When her error was discovered, Smith was advised he needed to request time off in advance and could not classify the time spent on his paternity case as "jury duty."  Smith was, however, permitted to classify all time spent on his paternity case as "jury duty" up until the time the error was discovered if he could produce paperwork to show he was in court or at a deposition on those dates.  According to Conway, Smith refused to provide evidence of his court attendance.  Smith claims he provided the required documentation when he requested the time off and was only given twenty-four hours to comply with CA's request after the mistake was discovered.

---

[9]According to Conway, CA discovered during the course of this lawsuit that Smith misrepresented his job history when he applied to CA.  Smith failed to disclose his employment at and termination from Inter-Tel, Incorporated, when seeking employment with CA.  According to Conway, discovery of this misrepresentation would have been an alternative ground for Smith's immediate termination.

On January 12, 2007, Smith filed his initial Complaint in the instant action.  On May 24, 2007, Smith filed a second EEOC charge, alleging CA retaliated against him for filing the first EEOC charge by terminating his employment.  After Smith received a right to sue letter for his second charge, the Court allowed him to amend his complaint to add that claim to this action.  Defendant has now moved for summary judgment on all of Smith's claims.[10]

### Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  Id.  Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in his or her favor.  Id. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the

---

[10]Smith also sought to add additional defendants when he moved to amend his complaint. Ultimately the Court denied this request.  (See Dkt. #s 52 and 65)

nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. Chelates, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  Anderson, 477 U.S. at 248-49.  This Court may not decide a genuine factual dispute at the summary judgment stage.  Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990).  "[I]f factual issues are present, the Court must deny the motion and proceed to trial."  Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir.1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248; Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990).   However, there must exist a conflict in substantial evidence to pose a jury question.  Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989).

## Discussion

Smith's Amended Complaint alleges causes of action for discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").  Smith has alleged two claims of retaliation.  The first relates to Greco's alleged retaliation for Smith's participation in the Heggeland investigation.  The second relates to CA's alleged retaliation for Smith filing his first EEOC complaint.

I.    **Procedural Issues**

CA argues all Title VII claims arising from Smith's first EEOC charge are time-barred because Smith's initial Complaint was filed more than ninety (90) days after Smith should have received his first EEOC right to sue letter.  Pursuant to 42 U.S.C. § 200e-5(f)(1), in cases where the EEOC does not file suit or obtain a conciliation agreement, the EEOC "shall so notify the person aggrieved and within 90 days after the giving of such notice a civil action may be brought against the respondent named in the charge . . . by the person claiming to be aggrieved. . . . "  In <u>Zillyette v. Capital One Financial Corp.</u>, 179 F.3d 1337, 1341 (11th Cir. 1999), the Eleventh Circuit held that "a three day period, analogous to the federal rule governing time for taking action after service by mail, *see* Fed.R.Civ.P. 6(e), provides an appropriate period for a plaintiff to act to receive an unsuccessfully delivered letter."  The court went on to state that "[p]roviding a three-day period also provides a clear rule that will enable parties to be aware of when they must act or forfeit their right to sue, " and that "[a]ny other hardships to plaintiffs can be accommodated by the equitable tolling rules" generally applicable in Title VII actions.  <u>Id.</u>

The EEOC issued Smith's first right to sue letter on October 5, 2006.  Allowing three days for postal service, Smith should have received the letter or notice of attempt to deliver the letter by Tuesday October 10, 2006.  Smith would then have the three-day period set forth in <u>Zillyette</u> to retrieve the letter, which he should have done by October 13, 2006.  Smith's ninety day period would have thus expired on January 11, 2007.  Smith filed his lawsuit on the next day, January 12, 2007.

Smith claims to have received notice that he had a certified letter to be picked up at the Northdale Carrier Annex.  Due to the fact the Annex was only open from 9 a.m. to 4 p.m., which conflicted with his work schedule, Smith was unable to pick up his mail until Saturday, October 14, 2006.  Smith then read the notice on the face of the letter and claims to have responded within ninety days.  Smith argues these circumstances justify equitable tolling of one day, and that his lawsuit was timely filed.

Smith's claims relating to his first EEOC complaint are time barred, but even if they weren't they would fail on the merits.  It is undisputed that his claims relating to his second EEOC right to sue letter are timely.

## II.    Discrimination Claims

Smith's first cause of action alleges racial discrimination under Title VII.  His third cause of action alleges racial discrimination under Section 1981.  Courts apply the same analytical framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to analyze disparate treatment race discrimination claims brought under both Title VII and Section 1981.  <u>Sledge v. Goodyear Dunlop Tires North America, Ltd.</u>, 275 F.3d 1014, 1015 (11th Cir. 2001).  Smith has not presented any direct evidence of racial discrimination.  In order to establish a prima facie case of racial discrimination based on circumstantial evidence, Smith must demonstrate that: "(1) he belongs to a racial minority, (2) he was subjected to an adverse job action, (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was

qualified to do the job"  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing McDonnell Douglas, 411 U.S. at 802).

If Smith can establish a prima facie case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its challenged employment action.  McDonnell Douglas, 411 U.S. at 802.  If Defendant proffers such legitimate reasons, the presumption would be rebutted and dropped from the case.  Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1196 (11th Cir. 1997).  The burden then shifts back to Smith to demonstrate that Defendant's proffered reasons were mere pretext.  McDonnell Douglas, 411 U.S. at 806.

Smith's discrimination claims all arise from his first EEOC charge.  Smith filed this charge on August 15, 2006, prior to the termination of his employment.  CA argues Smith cannot establish a prima facie case of discrimination because he has failed to show he was subjected to an adverse job action.  Smith argues he was referred to as "bitch" and "boy" by Heggeland and was subjected to subsequent adverse actions that rose to the level of constructive discharge.  According to Smith, such actions included Greco's desire to move forward with his termination thirty days into his PIP based on his false assumptions and inaccurate information.

A review of the record reveals that CA fired Heggeland as a result of his comments. Moreover, Greco did not terminate Smith's employment thirty days into the PIP.  Thus, these actions cannot constitute adverse employment actions for purposes of Smith's Title VII and Section 1981 Claims.

The Court must also consider whether Smith's placement on the PIP constitutes an adverse employment action.  In <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1239 (11th Cir. 2001), the Eleventh Circuit held that in order to support a Title VII claim, an employer's action "must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." An employee must show a "*serious and material* change in the terms, conditions, or privileges of employment" as viewed by a reasonable person under similar circumstances.  <u>Id.</u>[11] (emphasis in original).

Smith has failed to show that his placement on the PIP, or any other actions taken by Greco prior to the termination of his employment, seriously or materially altered the terms, conditions, or privileges of his employment.  His placement on the PIP did not result in a change to his compensation or his position.  While he was advised to comply with company policies regarding time off, these policies were in effect prior to his placement on the PIP. Requiring him to abide by policies already in existence did not alter the terms, conditions, or privileges of his employment, even if prior managers had not enforced the policies as strictly as Greco.

---

[11]The Court notes that the Eleventh Circuit's recent decision in <u>Crawford v. Carroll</u>, 529 F.3d 961, 974 (11th Cir. 2008) changed the standard to a more liberal view of what constitutes an adverse employment action.  However, as noted by the Eleventh Circuit, this standard applies only to Title VII retaliation claims and "has no application to substantive Title VII discrimination claims; the prior standard remains applicable to such claims."  <u>Crawford</u>, 529 F.3d at 974 n14.  The Court will address this standard in its discussion of Smith's retaliation claims.

Smith has failed to show he suffered an adverse employment action with respect to his discrimination claims.  Accordingly, he has failed to establish a prima facie case for racial discrimination under Title VII.  CA is entitled to summary judgment on those claims.

## III.    Retaliation Claims

Under Title VII, it is unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter of Title VII."  42 U.S.C. §2000e-3(a).  In order to establish a prima facie case of retaliation under Title VII, Smith must show that: (1) he engaged in an activity protected under Title VII; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  Crawford v. Carroll, 529 F.3d 916, 970 (11th Cir. 2008).

In considering if, and when, Smith suffered an adverse employment action for purposes of his retaliation claim, the Court  turns to the Eleventh Circuit's recent decision in Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008).  In Crawford, the Eleventh Circuit discussed the effect of the United States Supreme Court's decision in Burlington N. & Santa Fe Ry. Co. V. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed. 345 (2006).  As discussed in Crawford,  "[u]nder the holding of *Burlington,* the type of employer conduct considered actionable has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the

plaintiff, irrespective of whether it is employment or workplace related." <u>Crawford</u>, 529 F.3d at 973 (citing <u>Burlington</u>, 126 S.Ct. at 2415).  In the context of a Title VII retaliation claim, "a materially adverse action 'means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Id.</u> at 974 (quoting <u>Burlington</u>, 126 S.Ct. at 2415).  The <u>Crawford</u> court went on to note that "<i>Burlington</i> also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute an adverse employment actions." <u>Id.</u> at 974 n13.

The Court must first consider whether Smith's placement on the PIP was an "adverse employment action" under <u>Crawford</u> and <u>Burlington</u>.  A section of PIP labeled "Consequences" provides the following warning: "[i]f you fail to meet any of the requirements set forth in this Plan in the specified timeframe, you will be subject to further disciplinary action, including the termination of your employment with CA."  The threat of such a warning is more than a petty and trivial action and might deter a reasonable employee from making or pursuing a charge of racial discrimination.  Accordingly, it is more appropriate for a jury to decide whether Greco placing Smith on the PIP was "materially adverse" to Smith, and thus an adverse employment action under standard articulated in <u>Crawford</u> and <u>Burlington</u>.  <u>See</u> <u>id.</u>

To prove a causal connection, the last element of Smith's prima facie case, he need only demonstrate that "the protected activity and the adverse action were not wholly unrelated." <u>Farley v. Nationwide Mut. Ins. Co.</u>, 197 F.3d 1322, 1337 (11th Cir. 1999)

(additional citations omitted).  A plaintiff "satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action."  Id.

The time period of six months between the Heggeland investigation and Smith's placement on the PIP by Greco is not close enough in temporal proximity to establish a causal connection.  See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) (holding a "three to four month disparity between the statutorily protected expression and the adverse employment action" is not close enough in temporal proximity to meet the burden of causation).  Absent any additional evidence, Smith has failed to show causation and has thus failed to establish a prima facie case for retaliation with respect to his first EEOC charge.

The Court now turns to Smith's second EEOC charge in which Smith claims he was terminated in retaliation for filing his first EEOC charge.  Smith has clearly established a protected activity and an adverse employment action with respect to this claim.  Again, the Court must consider whether he has established a causal connection.

Smith's charge was filed on August 15, 2006.  Smith was fired approximately two and a half months later.  While this is close to the "three to four" month disparity addressed in Thomas, CA has failed to cite any Eleventh Circuit cases that have considered whether this time period is of sufficient temporal proximity.  For purposes of this Order, the Court will assume two and a half months is sufficient and that Smith has established a prima facie case of retaliation.

Once a plaintiff has established a prima facie case of retaliation, the Court must apply the same McDonnell Douglas burden shifting framework. CA argues it has articulated legitimate and non-discriminatory reasons for Smith's termination. The Court agrees. Smith has admitted that he was repeatedly warned to request time off from his direct manager. He also admits that he was warned his job was in jeopardy for failure to adhere to the company's leave policy. Moreover, Smith agreed that the portion of the PIP that addressed him frequently missing work was legitimate.

With respect to his actions on October 25-26, 2006, Smith admits he failed to call Gwozdz back regarding the web demo because his phone battery died. While he disagrees with CA about what he communicated to Golden and HR, he does not dispute that he took off work October 26, 2006, even though the October 26 hearing had been cancelled. When questioned during his deposition about why he did not return to work on October 26th when he found out the hearing was cancelled, he answered that he took the remainder of the day off to do his legal work.

Upon consideration, the Court concludes that the stated reasons for Smith's termination were legitimate and non-discriminatory. As Smith himself admits, employers have a legitimate expectation to have their employees present during the work place. Smith even acknowledges the PIP was justified with respect to his attendance issues. Moreover, he has admitted that he did not follow company policy regarding his requests for days off. Taking these facts into consideration, combined with Smith's taking off October 26th for a court hearing that never occurred and his failure call back Gwozdz, no reasonable jury could conclude CA lacked a legitimate reason for terminating his employment.

Since CA has met its burden of establishing a legitimate reason for Smith's termination, the burden shifts back to Smith to overcome the nondiscriminatory reasons proffered for his termination.  When questioned at his deposition about his basis for believing he was fired in retaliation for his first EEOC charge, Smith answered as follows:

> Well, the time proximity – the e-mails, several e-mails given to me by Jackie O'Neill when she states that my job is in danger.  It just seems like very pretextual like they were looking for a reason to fire me, where she goes on to state even if you are not on the PIP, any violations or any of this is terms for us to terminate you without any cause.  She made that quite clear.

(Smith Dep. at 327).  Plaintiff has failed to provide any evidence of pretext.  "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer."  Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001) (additional citation omitted).  The reasons proffered for Smith's termination certainly could have motivated a reasonable employer.  Smith repeatedly failed to follow company policy regarding requests for time off and took a day off to attend a court hearing that never occurred.  As Smith has failed to produce sufficient evidence to create a genuine issue of fact that the reasons proffered by CA for his termination were not the real reasons he was terminated, CA is entitled to summary judgment on Smith's remaining claim for retaliation.

## IV.   Harassment Claims

To the extent Smith's Amended Complaint can be construed to state a claim for hostile work environment, the Court will consider such a claim.  In order to establish a

hostile work environment claim under Title VII, a plaintiff must prove that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). A plaintiff wishing to establish a hostile work environment claim must show: "(1) that he belongs to a protected group, (2) that he has been subject to unwelcome harassment, (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin, (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." Id.

There is no dispute that Smith was a member of a protected group as a biracial African American and Caucasian. Smith has provided evidence of only two instances in which he was arguably harassed based on his protected characteristic. The first instance involved the "bitch/boy" comments made by Heggeland. The second instance involved the comments made by Greco about African American fathers. The other incidents Smith claims created a hostile work environment include: (I) Smith's placement on the PIP, (ii) the vomiting and "dead fish" incident, (iii) Greco's allegedly failing to grant him leave, (iv) Greco's tone in addressing Smith in front of a trainee, (v) Greco's failure to promote another African American employee, (vi) an email from a co-worker to a client erroneously stating that Smith had left CA, and (vii) the blocking of Smith's personal email account. Smith has failed to

produce evidence that any of these incidents were based on his race or any other protected characteristic.

The requirement that the alleged harassment be sufficiently severe or pervasive to alter the conditions of employment contains both an objective and a subjective component. Id. at 1276. In order to be actionable, the harassing behavior "must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive.'" Id.; (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 (1993)). In evaluating the objective severity of the conduct, the court must consider: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employees job performance." Id.

With regard to Greco, Smith has presented evidence of only one stray remark made about African American fathers. Regardless of how Smith may have perceived the comment, it was not objectively frequent in nature or severe enough to be actionable. At most, it was an utterance that, even if wrong, in no way interfered with Smith's job performance.

Heggeland's conduct and comments, which occurred at least six months prior to Greco's stray remark, were more severe in nature. Heggeland was Smith's co-worker, not his supervisor. An employer is liable for harassment from a co-worker under Title VII "when the employer knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action." Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000). Upon being advised of Heggeland's comments, CA took

appropriate remedial action by investigating Heggeland and ultimately terminating his employment.

In conclusion, the conduct for which Smith complains was neither sufficiently severe nor pervasive enough to alter the conditions of his employment.  Accordingly, Smith has failed to establish an essential element of his hostile work environment claim.  Thus, CA is entitled to summary judgment on all of Smith's claims.

It is therefore ORDERED AND ADJUDGED that:

1.      Defendant CA, Inc.'s Motion for Summary Judgment (Dkt. 60) is **GRANTED**.

2.      The Clerk is directed to enter **FINAL SUMMARY JUDGMENT** against Plaintiff Walter C. Smith and in favor of  Defendant CA, Inc., with respect to all of Plaintiff's claims.

3.      All pending motions are denied as moot.  The Clerk is directed to close this file.

**DONE** and **ORDERED** in Tampa, Florida on December 30, 2008.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2007\07-cv-78.msj.frm